KAHOUN ET AL. *v.* THE STATE OF OHIO.

2

(Decided June 3, 1929.)

*Messrs. Payer, Minshall, Karch & Kerr,* for plaintiffs in error.

*Mr. Gilbert Bettman,* attorney general, and *Mr. R. J. Kunkel,* for defendant in error.

LEVINE, J. Charles F. Kahoun, as principal, and Frank Mazanec, as aider and abetter, were convicted of fraudulently writing into the Republican poll book the names of seventy persons alleged not to have voted in ward 13, precinct R, in the primary election held August 14, 1928, in Cuyahoga county. Error proceedings are prosecuted to this court seeking a reversal of such judgment of conviction.

Various assignments of error are set forth in the brief of counsel for the accused, which are specified as follows:

(1) The indictment did not lay a crime under the statute.

(2) There was gross misconduct of the attorney general in the *voir dire* examination.

(3) There is no evidence whatsoever to sustain the conviction of Frank Mazanec.

(4) The conviction of Charles F. Kahoun is clearly against the weight of the evidence, and venue was not proved.

(5) There was error in the court's failure to charge the jury forthwith after argument, in its refusal to give defendants' special request to charge, and in the general charge as given.

(6)  Competent testimony offered by defendants was excluded.

(7)  The court erred in its refusal to continue or pass the case because of impossibility to obtain an impartial jury, in its failure to sustain defendant's objection to trial in the new courthouse, and because it sustained the state's exception to incorporation in the bill of exceptions of affidavits of jurors at a previous trial.

(8)  There was misconduct of the attorney general at the conclusion of the case.  Summarizing these specifications of error, there are two major assignments: (1) Errors of law; (2) that the conviction of these plaintiffs in error is not sustained by the evidence.

We shall first take up the assignment as to error of law.

Does the indictment lay a crime under the statute? This question arises both by virtue of the demurrer to. the indictment and by the objection to the introduction of any evidence.  The statute under which the indictment was returned is Section 13350, General Code, as follows:

"Whoever, from the time ballots are cast or voted until the time has expired for using them as evidence in a contest of election, wilfully and with fraudulent intent, inscribes, writes or causes to be inscribed or written in or upon a poll-book, tally-sheet or list, lawfully made or kept at an election, or in or upon a book or paper purporting to be such, or upon an election return, or upon a book or paper containing such return, the name of a person not entitled to vote at such election or not voting thereat, or a fictitious name, or, within such time, wrong-

fully changes, alters, erases or tampers with a name, word or figure contained in such poll-book, tally-sheet, list-book or paper, or falsifies, marks or writes thereon with intent to defeat, hinder or prevent a fair expression of the will of the people at such election, shall be imprisoned in the penitentiary not less than one year nor more than three years."

The pertinent portion of the indictment is:

"That on the fourteenth day of August, 1928, in the City of Cleveland, in the County of Cuyahoga aforesaid, a *primary election* was duly held, as authorized by the laws of the State of Ohio, and on said fourteenth day of August, 1928, after ballots had been cast and voted at said election, *Charles F. Kahoun* unlawfully, wilfully and with fraudulent intent, did write in and upon a poll-book, lawfully made and kept at an election, to-wit, the poll book of Precinct R, Ward thirteen, in said city of Cleveland aforesaid, at such Primary Election aforesaid, the names of seventy (70) persons more or less, not voting thereat, with intent to defeat, hinder or prevent a fair expression of the will of the people at such election, contrary to the statute in such case made and provided and against the peace and dignity of the State of Ohio."

Frank Mazanec is charged with aiding and abetting Charles F. Kahoun in the commission of the crime set forth in the indictment. It is claimed by counsel for the accused that by the language of the statute time is made as of the essence of the crime; that the act must have been committed "from the time ballots are cast or voted, until the time has expired for using them as evidence in a contest of election." It is therefore claimed that the indict-

ment is fatally defective for failure to allege the commission of the crime within said time, citing Section 13581, General Code, which reads, in part:

"An indictment shall not be invalid, and the trial, judgment or other proceedings stayed, arrested or affected * * * for omitting to state the time at which the offense was committed, in a case in which time is not of the essence of the offense; * * *."

Also citing *Ellars* v. *State,* 25 Ohio St., 385, 388:

"It is a well-settled rule of criminal pleading, that an *indictment must aver, with reasonable certainty, all the material facts which are necessary to be proven, to procure a conviction.*"

The indictment in the present case charged that the crime was committed on August 14, 1928, and it is contended that this allegation is not a compliance with the requirement of the statute that time is a part of the definition of the crime of fraudulent writing on poll books or tally-sheets. The statute reads as follows: "Whoever, from the time ballots are cast or voted until the time has expired for using them as evidence in a contest of election, * * *."

Counsel for the accused contend that Section 13350, General Code, upon which the indictment was based, refers to general elections only, and that it does not refer to primary elections; that the statute contemplates that the crime set forth in said section can only be committed in an election in which there can be a contest; that, since there is no provision for the contest of primary elections, the crime defined in Section 13350, General Code, of fraudulent writing on poll books or tally sheets, cannot be made applicable to the primary elections. It is a sufficient answer to that contention that Section 13324, General Code, provides:

"All provisions and requirements of law to preserve and protect the purity of elections, and all penalties for the violation of such laws shall apply and be enforced as to all primary elections."

The section under which the indictment was drawn, which makes it a crime to fraudulently write on poll books or tally-sheets, was undoubtedly passed to preserve and protect the purity of elections, and therefore, by virtue of the provisions of Section 13324, is made applicable to offenses relating to primary elections.

Was there gross misconduct of the attorney general in the *voir dire* examination? It appears that counsel for the accused questioned several prospective jurors as to whether or not they read in the newspapers of the disagreement of prior juries in the previous trials of the same case, and that, thereafter, the attorney general, in the presence of a full panel and numerous other jurors waiting in the room to be interrogated, asked the following question:

"Q. Mr. Wilhelm, you and others have just been asked by Mr. Minshall whether you read in the newspapers that there was a disagreement in the previous trial of this case. *I will ask you whether you read in the newspapers that the jury stood 11 to 1 for the state of Ohio?*"

Objection was made to the question, which objection was overruled and an exception taken. Then follows a series of questions of counsel for the accused, and also of counsel for the state, as to how former juries stood in the former trials.

We are of the opinion that the entire inquiry as to how former juries stood on the question of the

guilt or innocence of the accused in former trials was wholly improper; that the trial court would have been justified had it forestalled any inquiry by either side relating to that subject. Counsel for the accused unquestionably opened up this inquiry on this wholly irrelevant subject. The attorney general, following in the wake of this inquiry, likewise engaged in interrogation which was entirely improper.

In the case of *State* v. *Auerbach,* 108 Ohio St., 96, 104, 140 N. E., 507, 510, the court said:

"Much reliance must be placed in the trial court to see that a fair trial is had and that no injustice is done either party. This is his highest duty, and only when he appears to have failed in this great trust will a reviewing court intervene."

A short time after the statements and questions of counsel on this irrelevant subject, the trial court admonished the jury as follows:

"I want to say to you that remarks were made in your presence as to how former juries stood. I will say at this time that you are entirely and absolutely to banish from your minds the standing of other juries; and if you are accepted as jurors in this case you will decide this case from the law, and the evidence, as you may find the evidence to be, not considering whatever what may have been done in former cases, nor the number that stood one way or the number that stood another way."

This action upon the part of the trial court in so admonishing the jury is, in our opinion, in compliance with the language of the Supreme Court in *State* v. *Auerbach, supra,* and, under the circumstances, precludes the question of error based on misconduct of counsel for the state.

Was there error in the failure of the court to charge the jury forthwith after argument? It is pointed out by counsel for the accused that the state's opening argument was completed at 3:30 p. m., and that the defendant waived argument. Nevertheless, the court refused to charge the jury forthwith, but adjourned court until 9:15 a. m. the next day, at which time the charge was given. We are cited to Section 13675, General Code, which reads:

"After the jury is impaneled and sworn, the trial shall proceed in the following order: * * *

"7. The court, after the argument is concluded and before proceeding with other business, shall forthwith charge the jury; * * *."

Counsel for the accused contend that the mandatory requirement of this section was not complied with, because the trial court did not charge the jury forthwith at the conclusion of the argument. Had the statute read, "the court after the argument is concluded shall forthwith charge the jury," the interpretation sought by counsel for the accused would be entirely correct, but it will be seen that the language of the statute is, "the court, after the argument is concluded and before proceeding with other business, shall forthwith charge the jury." Construing the language as a whole it lends itself to the reasonable interpretation that, after the argument has been made, no new matter shall be taken up by the court. It is conceded, on the record, that no new matter was taken up by the court between the conclusion of the argument and the giving of the charge to the jury, and, in our opinion, the action of the court was in compliance with the requirements of the Code. Were we to sustain the contention of

counsel for the accused that the language of the section "and before proceeding with other business" must be entirely disregarded, and that the duty of the trial court is to charge the jury immediately upon the conclusion of the argument, we would place an impediment in the path of the trial court, as the court would be given no time for contemplation or preparation when it deemed the same necessary in order to give a proper charge to the jury.

Was there error in the court's refusal to give defendants' special request, and was there error in the general charge of the court as given? The special request which the court refused to give is as follows:

"The state must prove every element of the crime charged, including the element of fraudulent intent, beyond a reasonable doubt, against the defendants or either of them, before you can find the defendants, or either of them, guilty of the crime charged."

The part of the general charge objected to is as follows:

"You are instructed that all provisions and requirements of law in relation to elections apply to primary elections as well as to a general election."

It is well settled that the procedure in criminal cases with reference to requests to charge made at the conclusion of the evidence is different from the procedure in civil cases. Paragraph 5 of Section 13675, General Code, provides that "either party may request instructions to the jury * * * which shall be given or refused." An interpretation of the meaning of the section is found in the case of *Wertenberger* v. *State,* 99 Ohio St., 353, syllabus 1, 124 N. E., 243, which reads:

"Under Section 13675, General Code, the court is authorized but not required at the conclusion of the evidence, upon the request of the state or of the accused, to charge the jury before argument upon the points of law requested and pertinent to the case."

Thus it will be seen that it is entirely discretionary with the trial court, and that a refusal to give special requests to charge will not be considered as an abuse of discretion on the part of the trial court. The claim that there was error in the charge of the court as given, as above set forth, involves the same question already discussed with reference to the sufficiency of the indictment, and holding, as we do, that the section of the Code under which the indictment was drawn applies to primary elections, as well as general elections, it follows that the charge of the court objected to was in compliance with our interpretation of the law.

Was there error in the court's refusal to continue or pass the case because of the claim of the accused that it was impossible for them to obtain an impartial jury? In support of the motion to continue or pass the case, counsel for the accused stated to the trial court that there was a continuous campaign waged by the newspapers, assisted by the Cleveland bar association, which was bound to affect the impartiality of jurors called upon to serve in the case at bar. Counsel call attention to a special report in the newspaper of a meeting of the Cleveland bar association, scheduled for and held Tuesday, March 5, 1929, which aired the question of "What's wrong with the jury system of Cuyahoga county?" In the announcement of the meeting, it was stated that the

reason for the meeting was the current investigation of the election frauds. In this connection, counsel for the accused also objected to conducting the trial in the new courthouse, claiming that the transfer of the case from the old courthouse to the new courthouse would give the matter undue publicity.

Under the provisions of our Code, ample authority is found for the right of the accused to move for a change of venue, if the accused and his counsel feel that it is impossible to get a fair and impartial jury. Conditions no doubt may arise where, because of wide publicity and agitation by different organizations, a change of venue would be justified, but the record discloses no such motion for change of venue. In the *voir dire* examination, the prospective jurors who were finally chosen stated that they would not be influenced by anything except the evidence, and that they would be fair and impartial. The accused having chosen to proceed in spite of the unfavorable atmosphere claimed by them to have existed, instead of asking for a change of venue, cannot at this time be heard to complain because the trial court refused to continue or pass the case.

Counsel for the accused urge that there was error in the action of the court in excluding a whole class of people who were called as prospective jurors, when it appeared that they were acquainted with any election officials or precinct workers. The action of the trial court is based upon Section 11438, General Code, which provides that "Any petit juror may be challenged also on suspicion of prejudice against, or partiality for either party, * * *. The validity of such challenge shall be determined by the court, and be sustained if the court has any doubt

as to the juror's being entirely unbiased." The trial court, it will be seen, is given wide latitude in excluding prospective jurors.

As to the assignment of error that the court erred in sustaining the state's exception to incorporation in the bill of exceptions of affidavits of jurors at a previous trial, we fail to see how this action of the trial court can in any way affect the judgment of conviction which took place before these affidavits were presented in support of a motion for a new trial. If the trial court erroneously excluded these affidavits filed in support of a motion of the accused for a new trial, the reviewing court would have a right to consider these affidavits, if it holds that the trial court should have considered the same. We find it unnecessary at this time to decide whether these affidavits were properly or improperly excluded, for the reason that, in our opinion, the presence of these affidavits, had the trial court not excluded them, would not have made it mandatory on the part of the trial court to grant a new trial.

Was there error in the conduct of the attorney general at the conclusion of the case? Counsel for the accused points to the colloquy between court and counsel, as appears in the record, as follows:

"The Court: You may now proceed in argument on behalf of the defendants.

"Mr. Minshall: The Court may charge the jury.

"The Court: Ladies and Gentlemen of the Jury—

"Mr. Bettman: Just a minute—

"Mr. Minshall: We object. Just a minute.

"Mr. Bettman: *No argument?*

"The Court: They waived argument.

"Mr. Minshall: We object to the remark.

"The Court: They waived their argument.

"Mr. Minshall: Exception."

The remark objected to, and which is construed as misconduct, was the inquiry of the attorney general, "No argument?" In brief and argument of counsel for the accused, reference is made to this remark of the attorney general as an exclamation made in a loud voice, and that the same was intended to convey a prejudicial influence upon the minds of the jurors. In so far as the record is concerned, this remark of the attorney general appears as an ordinary remark. Whether it was made as an exclamation, or in a loud voice, with dramatic effect, the record does not disclose. The trial court, however, admonished the jury to pay no attention to the remark.

We have thus far considered errors of law, and the holding of this court is unanimous that no reversible errors of law occurred during the trial. We shall now direct our attention to the assignments of error: (a) That the conviction of Charles F. Kahoun is clearly against the weight of the evidence, and that venue was not proved; (b) that there is no evidence whatsoever to sustain the conviction of Frank Mazanec.

It appears from the record that on August 14, 1928, a primary election was held in Cuyahoga county, at which the defendant Frank Mazanec, a Republican, acted as presiding judge, and the defendant Charles F. Kahoun acted as Republican clerk, in ward 13, precinct R. This Republican poll book, which is the State's Exhibit 1, made and kept by the Republican clerk, Charles F. Kahoun, showed 112 names written in it. It further showed that the

first 42 of these names did not come in alphabetical order, that is, as to the letter with which the surname began, but that the names of the voters from 42 to 112 were in alphabetical order. About 46 of the people whose names appear between 42 and 112 were called by the state, and they testified that they did not vote in the primary election. One witness stated that she was in Michigan on that day. There was evidence that two of the names appearing upon the poll book as having voted were those of voters who had died prior to election day.

It is conceded that all these names as they appeared in alphabetical order in the Republican poll book were written in the handwriting of Charles F. Kahoun. In the Republican poll book, opposite the names of various candidates, appear erasures, which the state contends were made for the purpose of adding these 70 names following No. 42 to the total vote cast for these candidates. The ballot bag for ward 13, precinct R, when opened, revealed that there were contained therein 112 Republican ballots; that 42 of these ballots were marked by X marks before various candidates, without uniformity as to the different candidates for the different offices; that 32 of the remaining 70 were marked uniformly for the same candidates, except one ballot, which had an additional candidate; the 38 remaining ballots were blank ballots, containing no X marks whatever. The 42 ballots which were indiscriminately marked for different candidates all bore crease marks, indicating that they had been folded and placed in the ballot box, but the 32 ballots uniformly marked for the same candidates, and the 38 blank ballots, contained no crease marks whatsoever, showing that

they had not been folded. These 70 ballots, which represented 32 marked uniformly for the same candidates, and the 38 blank ballots, were found sandwiched in between the 42 ballots indiscriminately marked. There was evidence introduced by the state that the crosses on 17 of the 32 ballots uniformly marked for the same candidates were made by the same hand and with the same pencil; that the remaining 15 crosses were made by a different hand, but that "different" hand was on all 15 of the remaining ballots.

This evidence presented by the state, to say the least, called for explanation. The evidence as introduced by the defense was, in substance, that at about 3 or 4 o'clock a precinct worker entered the booth, checked the list, and that thereafter a rush started in the number of voters.

Charles F. Kahoun testified that he never wrote in a name when no one was there; that he wrote in no names whatsoever after the polls closed; he also stated that at about 3 or 3:15 p. m. some one came in with a printed list, and that he and a Democratic worker checked off the list, and gave the list back to the man; that thereafter from 4:00 to 6:30 p. m., the heaviest voting occurred. He admits that he wrote the names in the poll book appearing from 43 to 112, and all the other names except Nos. 1, 17, 18, 19 and 20; that he also wrote the names of the other officials to the certificates in the poll books, but asserts that it was all done in their presence and to facilitate the work; that he did not know any of the voters personally, nor did he know that 70 persons gave false names. In brief, the evidence of the defense is to the effect that a precinct party worker,

after checking off the lists about 3:00 p. m., was responsible for the rush, and that, even admitting that a great many whose names appear between Nos. 42 and 112 did not in fact vote, the fault does not lie with the election officials, but, instead, with the party worker, who caused a rush of illegitimate voters who gave the names of registered voters appearing on the alphabetical book. This, of course, does not explain the reason why the first 42 names appearing upon the poll book did not appear in alphabetical order, but the 70 names following, from No. 42 to No. 112, all appear in alphabetical order in the handwriting of Charles F. Kahoun. Added to that are the contents of the ballot bag, where it was found that between the 42 ballots indiscriminately marked for different candidates there were sandwiched in 32 ballots uniformly marked for the same candidates and 38 ballots which were not marked at all, none of which 70 ballots so sandwiched in were creased or folded, while the other 42 were creased and folded.

There is considerable conflict between counsel on the point made by the attorney general, namely, that there was evidence that as to the 32 uncreased, unfolded ballots, uniformly marked for the same candidates, 17 had upon them a cross-mark made in the same hand, while the remaining 15 crosses were made by a different hand, but by the same "different" hand. Counsel for the accused maintain that the handwriting expert on cross-examination was made to weaken in so far as his testimony relating to a cross-mark is concerned. While this may be true, yet, taking the evidence offered by the state as a whole, it calls for an explanation by the accused.

Whether or not the explanation made by Charles F. Kahoun was sufficient to overcome the inference of guilt which arose from the evidence introduced by the state is a matter within the exclusive province of the jury. The state unquestionably established one fact conclusively, that is, that more than a majority of the 70 names which appeared on the poll books in the handwriting of Charles F. Kahoun, from No. 42 to No. 112, as having voted at the primary election, did not in point of fact vote at all. It then became incumbent upon the accused to explain away this circumstance of guilt.

The jury apparently did not attach much credit to the explanation that a party precinct worker caused the late hour rush which is responsible for the additional 70 names. Counsel for the state was within his rights in pointing out to the jury the weakness of the explanation by referring to the alphabetical order in which these 70 names appear, which order was not observed in the first 42 names appearing upon the poll book, and also in referring to the contents of the ballot bag, which showed 70 ballots sandwiched in between the 42 ballots indiscriminately marked for different candidates, 32 of which were uniformly marked for the same candidates and 38 of which were blank, and all of which 70 ballots were never creased or folded.

It must be conceded that, in so far as Charles F. Kahoun is concerned, upon the showing made for the state, had Kahoun chosen to introduce no evidence whatsoever in his own defense, a verdict of guilty based upon the showing made by the state would have been entirely justified. Charles F. Kahoun, through his counsel, introduced evidence in his

own defense which sought to explain away incriminating inferences which arose from the evidence offered by the state. The jury was entirely within its province in attaching whatever credit it chose to the testimony of any of the witnesses. By their verdict of guilty, the jurors have practically stated that they did not attach credit to the evidence offered by the defense. The reviewing court is powerless to interfere with the discretion of the jury in its right to believe or not to believe the testimony given by any witness offered at a trial.

Was there any evidence tending to show that Frank Mazanec aided and abetted Charles F. Kahoun in the commission of the unlawful act charged in the indictment? It is our opinion that the evidence which appears from the record is ample to show that Frank Mazanec was presiding judge of the precinct. As presiding judge, it became his duty to be present during the entire day of voting, and to preserve and secure the purity of the election. It was his part to examine the ballots, discover whether the ballots were legitimately cast, whether the name could be legally voted, and to inspect each ballot before it was counted. At the conclusion of the state's case, a motion was made by counsel for Frank Mazanec that a verdict of acquittal be directed in his favor, as there was no evidence that he was present at the election booth. The Republican poll book offered by the state as Exhibit 1 showed that he so acted. The pay roll sheet, offered as Exhibit 3, and Exhibit 6, a, b, c, the Republican summary statement, also showed that he acted in that capacity.

It is our opinion that there was some evidence showing that he was present, and, in addition, there

is the presumption that he performed the duty required of a presiding judge that arises from the fact, shown in evidence, that the poll book, and also the pay roll sheet, so disclosed.

Frank Mazanec thereafter took the witness stand in behalf of Charles F. Kahoun, and there is no question whatsoever, taking the record as a whole, that he was present at the election booth the entire voting day.

The jury found that Charles F. Kahoun fraudulently wrote in the names of the many persons who did not vote at the election. The jury had a right to infer that Charles F. Kahoun could not have accomplished that without the aid and encouragement of the presiding judge, who was present. As to the content of the ballot bag, while the deposit therein took place after the act of Charles F. Kahoun, it yet constitutes strong evidence from which the jury had a right to infer that the presiding judge sought to harmonize the ballots with the fraudulent entries in the poll book, which the jury found were made by Charles F. Kahoun.

After minutely examining the record and the various assignments of error, we are of the opinion that there is no reversible error which would justify the upsetting of the jury's verdict.

The judgment of the common pleas court will therefore be affirmed.

*Judgment affirmed.*

SULLIVAN, J., concurs.

VICKERY, P. J., concurring. These actions came into this court on petitions in error to the common pleas court of Cuyahoga county, the purpose being

to reverse judgments of conviction against the plaintiffs in error who were defendants below.

Several errors are alleged as to why this judgment of conviction is erroneous and should be reversed, and, in order to understand the situation, it will be necessary to recite some of the salient facts relating to the matter in question.

It seems that the plaintiffs in error, together with one James Neville, were indicted under Section 13350, General Code, which reads as follows:

"Whoever, from the time ballots are cast or voted until the time has expired for using them as evidence in a contest of election, wilfully and with fraudulent intent, inscribes, writes or causes to be inscribed or written in or upon a poll-book, tally-sheet or list, lawfully made or kept at an election, or in or upon a book or paper purporting to be such, or upon an election return, or upon a book or paper containing such return, the name of a person not entitled to vote at such election or not voting thereat, or a fictitious name, or, within such time, wrongfully changes, alters, erases or tampers with a name, word or figure contained in such poll-book, tally-sheet, list-book or paper, or falsifies, marks or writes thereon with intent to defeat, hinder or prevent a fair expression of the will of the people at such election, shall be imprisoned in the penitentiary not less than one year nor more than three years."

The indictment alleges that the defendants, on the 14th day of August, 1928, after the ballots had been cast and voted at said election, fraudulently wrote into the poll book the names of 70 persons, more or less, not voting at said primary election, with intent to defeat, hinder, or prevent a fair ex-

pression of the will of the people at such election, contrary to the statute in such case made and provided. The record shows, as the law provides, that the state-wide primary was held on the 14th day of August, 1928. The soundness and validity of this indictment was challenged by demurrer and motions to quash; the theory being, first, that the indictment was so indefinite as to time that it did not state a punishable crime on its face. This argument is based upon that part of the statute which provides that an indictment may be returned, laying the time from between the date on which and after the ballots are cast or voted and the date when the time has expired for using them as evidence in a contest of election, and the statute in such case, Section 5090-1, General Code, provides that it shall be 30 days; and it is argued that, inasmuch as the indictment did not say that this alleged criminal act took place between the time after which the ballots were cast and the time in which the election might be contested, it was so indefinite as to time that it did not state an offense.

Although the indictment does allege that the alleged tampering with the poll book and tally sheets took place after the ballots were cast on the 14th day of August, 1928, that is, the same day on which the election took place, after the ballots were cast, it is argued that, inasmuch as there can be no contest at a primary election, the statute which relates to contest does not apply, and therefore there would be no time wherein they could allege the so-called crime to have been committed, and therefore that there was no crime committed within the meaning of the criminal statute. Whether there can be a con-

test of a primary election it is not necessary for us to decide. The Supreme Court in *State, ex rel. Meck, v. Board of Elections,* 111 Ohio St., 203, 145 N. E., 28, avoided deciding that question, saying in so many words that it did not decide the question as to whether there could or could not be a contest of a primary election, but we do not conceive it to be necessary to have that question decided, nor do we think that it follows that the crime as alleged in this indictment could not be committed, even though there could be no contest of a primary election. We think that the 30 days mentioned in the statute—and it being a general statute of the state of Ohio, the court must take judicial notice of such statute—simply mark out a time within which the commission of such a crime as alleged in this indictment must be laid, and we think that statute, so far as the time was concerned, applies to a primary election as well as to a general election. Now if that is so, the court, taking judicial notice of the statute laying down the time within which the commission of the crime must be laid in the indictment, when the indictment alleges that the crime is committed on the 14th day of August, 1928, after the ballots have been cast, we think it certainly states a time within the period within which the commission of such a crime must be laid, and surely, since the purpose of having a time pointed out in the indictment is to apprise the defendants of the time when they are charged with the commission of the offense or crime with such certainty that they are able to meet the charge as to time, there can be no objection to that in this indictment.

Further, it is urged that this statute cited does

not apply to primary elections, but only to general elections. In this connection I wish to quote the following from Section 13324, General Code:

"All provisions and requirements of law to preserve and protect the purity of elections, and all penalties for the violation of such laws shall apply and be enforced as to all primary elections."

Now this question was raised when they attacked this indictment in the trial court, and in whatever way the attack was made the trial court overruled the contention of the defendants below, to which ruling the defendants took the proper exception, and they raised that question in this court in a proper way, and so it was necessary for us to have said what we have said and to say what we further say in respect to the indictment and its sufficiency.

After the motions to quash and the demurrers were overruled, and an exception taken, the indictment was nollied as to James Neville, and a jury was empaneled and sworn to try the other two defendants, Kahoun and Mazanec, and, after trial to a jury, the jury brought in a verdict of guilty against both defendants, and they were sentenced to the penitentiary by the presiding judge for a period of one year, and are now in the penitentiary serving that sentence. The trial court refusing to admit the defendants to bail, and, the defendants not seeking a suspension of the sentence in the Court of Appeals, the sentence is now being carried into effect, and these defendants are now serving their sentences in the Ohio penitentiary, and it is to reverse the judgments under which they are serving that sentence that error proceedings are prosecuted here.

As already stated, several errors are urged as to

why this judgment of conviction should be reversed. We have gone over this record and heard the arguments of counsel and have familiarized ourselves with the briefs, and we are constrained to overrule the contention of the plaintiffs in error as to the ground that the indictment did not charge an offense within the meaning of the Ohio statutes. We think that the statute was meant to protect the purity of the ballot both at primary and general elections. It is just as important, nay, more important, to provide safeguards that proper and suitable persons shall be *nominated* as it is that any particular ones be elected, because, if you get improper persons, or if improper persons can use the primary to nominate improper candidates, the public will not be permitted in the general election to vote for proper candidates, and so the very fountain head of our government and the purity of the administration of its affairs must depend largely upon the character of the persons that are nominated; hence, if an unscrupulous set of persons can succeed in corrupting the very source of political power by illegally naming persons who are not the choice of the public, they can defeat the very end and aim of government; and so, when laws were passed for the purpose of protecting the purity of the ballot, the Legislature must necessarily have meant to protect the public at the very source of power, that is, at the election which nominates the persons who are to govern and carry on the affairs of the public. Therefore we think that the Legislature clearly intended that the law that we have cited should apply to primary as well as to general elections, and the court did not commit any error in overruling the motion or re-

fusing to quash the indictment in this respect; nor do we think that the question whether there could or could not be a contest of a primary election is the governing factor in the case. As already stated, if there can be no contest, the statute which provides for the preservation of the ballots until after the contest time simply marks out the period of time when the indictment might be laid, and it is not necessary to be able to contest a primary election in order to have one indicted for the crime of tampering with the poll book and tally sheets if the time laid in the indictment is within the time between the casting of the ballots on election day and 30 days thereafter. But even the right to contest a primary election is a mooted question in Ohio, as the Supreme Court asserts in *State, ex rel.,* v. *Board of Elections, supra.* So in this respect the errors urged are not maintainable.

It is urged, however, that the attorney general was guilty of misconduct in at least two particulars, and, in order to set forth this claim of misconduct, we must recite more of what is current history. This was the third time that these two men, whose names were left in the indictment, were tried. On the two former trials the jury disagreed. Of course, a matter of the public notoriety of this case, and the fact that two juries had disagreed, would be almost common knowledge, and so in the case here, in which these men were convicted, the last of the three trials, the learned counsel for the defendants asked of the veniremen before they were accepted in the panel whether or not they had read in the newspapers that this case had been tried before and that the jury had disagreed, and that upon one of the ballots the jury

stood eleven to one for acquittal. This question was asked by Mr. Minshall of the talesmen, and it was followed up by other questions as to whether they had read in the newspaper that the jury had disagreed a second time, when the jury stood nine to three. I think this question was propounded as much as six separate times to as many different veniremen. When, after the door had thus been opened, the attorney general asked one venireman whether or not he had read in the newspapers that at the last trial in which the jury disagreed the jury stood eleven to one for conviction, exception was taken to this, and the court, so far as he could, instructed the jury that they should disregard what any other jury had done, that this case was to be tried and decided upon the evidence that was introduced before this panel in this hearing; but counsel for defendants below, taking his exception, based his argument and a right to reverse this case on the ground of the misconduct of the attorney general.

We do not see how the attorney for the defendants below, plaintiffs in error here, after he had opened the door wide by making inquiries relating to the same subject, can complain because the attorney general likewise asked the question of a proposed talesman. If there was any colloquy between the counsel and the court and the attorney general, it was brought about by the queries of the defendants' counsel, which were just as improper as that of the attorney general could possibly be. I say, we do not see how he can complain about the query of the attorney general. In other words, by his questions on the same subject, he had invited that question from the attorney general, and we do not think that,

if there was any error in this, the defendants below are in a position to avail themselves of it, because they, through their counsel, were first to bring the question before the panel.

Another complaint about the misconduct of the attorney general is that, after the evidence had all been introduced, and the state had made its opening argument, the learned counsel for the defendants then told the presiding judge, to use his own words, "You may now charge the jury," which in effect was an announcement that he did not propose to argue the question, whereupon the attorney general, apparently a little surprised, said: "What, no argument?" to which the defendant below took an exception, and afterwards sought to have the jury discharged and the case continued because of the misconduct of the counsel for the state. For one, I cannot see how this prejudiced the defendants below in any way, nor in what way the attorney general was guilty of misconduct in giving expression to what must have been a surprise to him, from the vigorous manner in which the case had been handled by the counsel for the defendants. In any event, we do not think there is any such error in that remark of the attorney general that it would warrant a reviewing court in disturbing the verdict on this ground; nor did the court err when he refused to discharge the jury and continue the case.

It must be remembered that, while this case was of much notoriety, and had been thrice on trial in Cuyahoga county, the defendants, by a very simple application, by filing a few affidavits, could have had a change of venue, if they thought they could not get a fair and impartial trial in Cuyahoga county, and

could have had the case transferred to one of the neighboring counties. There is a provision for such a change of venue in our statutes, which the defendants did not seek to avail themselves of, and consequently people must necessarily know more or less about a case that has been tried three times and gained much notoriety.

Another error complained of is that, after the counsel for the defendants announced that he did not desire to argue the case—somewhere along in the afternoon, I believe—the court did not *eo instanti* charge the jury, but passed it over until the morning, and then charged them, and the error complained of is that the statute provides that the court shall immediately charge the jury. Now this member of the Court of Appeals has had that question before him many times while on the common pleas bench, and has had to construe that statute, and the statute means that *no other business* shall intervene. It does not mean the court cannot have time to get his thoughts together and prepare the charge. The court was probably as much taken by surprise by the refusal of the defendants' counsel to argue the case as was the attorney general, and perhaps at that moment was not prepared to give his charge; but there is nothing in this record which shows that the court did any other business. He simply postponed giving the charge until the next morning, presumably that he might gather his thoughts together and perhaps prepare his charge in writing so he might give it to the jury. We do not think there is any error in this respect.

Another ground of error is the refusal of the court in surrebuttal to admit the testimony of one man

as to the time when he voted. It seems that the thirty-ninth voter testified that he voted somewhere between 6:15 and 6:30, the polls closing by law at 6:30. The purpose of this evidence was to show that the number of votes that had been polled up to that time during the entire day was, I believe, 39, and only a few minutes were left in which votes could be legally cast, and during those few minutes the record shows that there were cast, not only the balance of the legal votes, alleged to be 42 in all, but 70 more in addition, and it was for the purpose of showing the impossibility of receiving this great number of votes during the short time remaining. Now about this time the testimony of a witness who had testified at a previous trial, whom the sheriff was unable to find, and who was No. 40 on the poll sheet, was offered in surrebuttal to show that he voted between 4:30 and 5:00. It is argued that this testimony would have shown that there was a longer time in which to cast these 70 votes.

Personally, I cannot see any reason why this testimony was not admitted, but the trial court held that it was testimony taken upon a preceding trial in cross-examination, and not for the same purpose for which the witness was then called, and that it was improper in surrebuttal in the instant case. However that might be, we do not think the error was so grave under the circumstances in this case that it would warrant a reviewing court in disturbing the verdict.

Now I come to the last and most important of all of the so-called errors, and that is: Was there any evidence in this record to sustain the verdict, first, against Mazanec, and, second, against Kahoun?

At the conclusion of the state's case, separate motions were made to direct a verdict in favor of each of the defendants, which motions were overruled, and it is urged that there was no evidence in the record at that time to show that Mazanec, at least, participated, aided, or abetted in the violation of the law. Mazanec was the presiding judge, and his duty was to be in control, and there was in the record the receipt for his compensation, which showed that he was present and participated and presided in this booth, and that was affirmative proof. Subsequently he got upon the witness stand, and admitted that he was present during the day and presided as presiding judge over that booth during the day.

In reviewing this record, if there was a scintilla of evidence at the conclusion of the state's case connecting Mazanec with this transaction, the final disposition of his rights must be based upon the evidence as it was submitted to the jury, and that evidence shows beyond any question that Mazanec was present and participated in this election and presided over it, and that Kahoun was the clerk in the booth.

It is claimed that there is no evidence to convict Kahoun in this record. Here we have the record, from which apparently 42 valid votes were polled by 6:30 that day. At that time the poll books and sheets which are before us show that 42 persons had appeared irregularly during the day, and that their names had been written down chronologically, one after the other, as each came in, and that they had voted variously for the different candidates that were upon the ticket, and those 42 had been carried out in the poll books. Up to this point each person

that had been given the votes at that election had been credited with the proper number of votes cast for him, and then, from there on the poll books show a situation which, but for its truthfulness, would be incredible, and that is, that 70 names, written by Kahoun on the poll book that was given the election officers of that booth by the election board—the election booth being presided over by Mazanec—were listed alphabetically, and I defy any one, in the entire realm of chance, to show any instance where 70 persons come into the booth in alphabetical order to have their names written down in alphabetical order. That could not have been done without the collusion or connivance of Mazanec. It could not have been done except it were done voluntarily. It is impossible to have anybody believe, by the doctrine of chances, that such a thing is possible, that 70 persons, whether they are brought in by ward workers or whether they come in voluntarily, or any other way, would come in and vote in alphabetical order and their names be written down in the poll book in that way. That alone not only proved this lawsuit, *beyond a reasonable doubt,* of the guilt of Kahoun, but it demonstrates it to a *mathematical certainty.*

But that is not all: After the 42 regular votes had been carried out and tallied, marked up to the credit of the respective candidates to the number that each had received, there is added to each one of a certain group of candidates—and they are the same in every instance—70 votes, and where one originally had 33 votes, he has on the tally sheet, as delivered by Mr. Mazanec to the board of elections, 103 votes; and where another man had 39 votes he is credited

with 39, plus 70, which make 109 votes; and so on all down the list; and it was done so bunglingly that it seems to have defied criticism, for they added the number boldly to those that were cast and entered upon the poll book before. Whether that was done in that voting booth, or whether it was done somewhere else, it matters but little. Wherever it was done, it was done by Mr. Kahoun, and it could not have been done without the knowledge or connivance of Mr. Mazanec. Mr. Mazanec, knowing that there had been 42 votes polled, carried that poll book and the ballots to the board of elections, and reported there that there had been 112 votes polled in that booth, where, as a matter of fact, there had been but 42.

Another thing, to make it still more a case of demonstration: There were 112 votes or ballots found in the ballot bag, and they were put there and were wired up by Mr. Mazanec. It is singular the condition in which they were when found, as shown by the record in this case. The 42 that were actually cast were on one side of the bag, and they were marked irregularly, with different check marks and for various candidates, as they would and should be if valid and *bona fide* votes. Then on the other side of the bag were 32 votes, which were marked by the same hand and all marked for the same bunch of candidates, and wedged in between these 32 votes or ballots, marked in that way, and the 42 that had been regularly cast, were 38 ballots that had no mark on whatever, and those ballots and many of them were torn from the book of ballots that had been furnished by the election board, in bunches, because the same fragment of paper that came from

the stub was on each ballot the same way, which shows that, instead of these ballots being torn off one by one and being delivered to the voters as they came into the booth, as the law requires, they were torn off in bunches and put in the ballot box and then wired together and carried to the election board by Mazanec, the presiding judge of the booth; and he reported that there were 112 votes cast in that precinct and that the various candidates had the various numbers that had been supplied by him or by Kahoun or by somebody, necessarily with the knowledge and connivance of Mazanec, because it could not have been done in any other way; it could not have been done at all if he had been performing his duty. After the ballots were all cast, if he had taken all the votes and put them in the bag and carried it to the board of elections, as he was bound to do, there could have been no fraud in connection with this vote. And if Mr. Kahoun, or anybody else, was permitted by Mazanec to take those votes to another place, and to add to them, Mazanec cannot plead innocence in that respect, and so the attorney general is right when he argues that the state has not only proven this case beyond a reasonable doubt, but has demonstrated to a mathematical certainty that there was fraud, and that the statute under which these men were indicted was violated. When one comes to consider the evidence, leaving out the expert as to handwriting, there are so many marks, so many things, which are unanswerable, that they can point only to one thing, and that is the guilt of the accused, and one wonders, on reading this record and looking at these exhibits, how there ever could have been any disagreement of any kind of any jury.

It won't do to lightly slur over a fraud upon the ballot, for the very foundation of our government, of a democracy, is based upon the sacredness of the right to vote, and that right to vote is like the will-o'-the-wisp, unless fraud be detected and punished. If a few men for the purpose of aiding some friends, or for any reason whatever, can defeat the will of the people, and force on them persons whom they did not select as their candidates, or defeat the will of the people in a general election, then we might as well close up our courts and forget that there ever was a democracy and admit that self-government is a failure; and I for one have not come to that conclusion. It won't do to treat lightly these matters and to smile on them because perhaps they have been of frequent occurrence. I am afraid, from this record and the crudeness and boldness with which the whole thing was accomplished, that it indicates that it was done many, many times before; but, if men who do these things are punished, it will throw the fear of God into the hearts of those who have the election machinery in hand, and it is encouraging to know that a jury of citizens in our own county have the bravery and fortitude to find men guilty, no matter how they may sympathize with them, because there can be no more serious crime than this, and it is striking at the very foundation of our government, and it won't do to smilingly set it aside.

We think upon reviewing this record that the guilt of these accused has been proven beyond a reasonable doubt; nay, it has been demonstrated to a mathematical certainty, and the court would be stultifying itself if it reversed this case.

Having reviewed the entire record and disposed

of all the claims of error that are made in this case, we can see no reason why this verdict should be disturbed.