**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————————

Nos. 22-2967, 22-3025 & 22-3042

—————————

THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY
CASUALTY UNDERWRITERS; THE INSTITUTES, LLC,

Appellants in No. 22-2967

v.

ADAM POTTER; PBIH, LLC, FKA Business Insurance Holdings LLC;
BUSINESS INSURANCE HOLDINGS, INC.

BUSINESS INSURANCE HOLDINGS, INC.,

Appellant in No. 22-3025

ADAM POTTER,

Appellant in No. 22-3042

—————————

On Appeal from the United States District Court
for the District of Delaware
(D. C. No. 1-19-cv-01600)
District Judge:  Honorable Richard G. Andrews

—————————

Submitted under Third Circuit LAR 34.1(a)
on November 1, 2023

Before: MATEY, ROTH and AMBRO, <u>Circuit Judges</u>

(Opinion filed: August 5, 2024)

ROTH, Circuit Judge

This appeal involves a noncompete agreement. We will affirm the District Court's order and hold that Adam Potter and Business Insurance Holdings, LLC (BIH) breached the noncompete agreement. We further hold that the American Institute for Chartered Property Casualty Underwriters (AICPCU) and The Institutes, LLC (Institutes) (collectively, Buyers) are therefore entitled to nominal—but not compensatory—damages.[1] We will vacate in part and remand with instructions to extend the term of the injunction through April 29, 2026. We will also affirm the denial of attorneys' and expert fees.

## BACKGROUND[2]

Buyers provide professional education and development in insurance, risk management, underwriting, and claims. In 2018, Buyers entered into an Asset Purchase Agreement (APA) with Adam Potter, Claims Pages, LLC (CP), C&E MGMT and Planning, Inc. (C&E), CLM Group, Inc. (CLM), and Moxie HC, LLC (Moxie). Under the APA, Buyers paid approximately $20 million to acquire substantially all of CP, C&E,

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] The Institutes is a wholly owned subsidiary of AICPCU.

[2] We write only for the parties and therefore recite only the most essential facts.

and CLM's assets.[3]  The APA allowed Potter to retain PBIH, LLC—a news and information subsidiary of C&E—which was renamed Business Insurance Holdings (BIH).[4]

The APA contains noncompete and non-solicitation provisions (collectively, the Restrictive Covenant) which prohibit all "Selling Parties," defined as "the Companies, Adam Potter and Moxie," from competing with "Sellers' Businesses."[5]  The Restrictive Covenant provides:

> (a) During the [Noncompete Period], each Selling Party covenants and agrees not to, and shall cause its Affiliates not to, directly or indirectly . . . engage in . . . any business [activity] . . . that [is] otherwise competitive with any of the Sellers' Businesses . . . , except that . . . any Selling Party, or any other party listed on Schedule 6.12, may undertake the [Permitted Activities] set forth on Schedule 6.12 . . . .

> (b) With the exception of Permitted Activities, . . . each Selling Party shall not . . . call-on, solicit or induce, or attempt to solicit or induce, any customer or other business relation of Buyer for the provision of products or services related to any of Sellers' Businesses[.][6]

The APA next defines the businesses at issue, giving meaning to the terms of the Restrictive Covenant.  For example, CLM is "a national trade association for the claims and litigation management industries"[7] whose business includes "conferences . . . . not

---

[3] This included a Purchase Price of $17,329,028 at closing plus other payments of over $2.6 million based on revenues in the following year.

[4] BIH is "a news and information source" for "risk managers, insurers, brokers and other[s]" "about risk and the impact on their business."  App. 2288.

[5] App. 2185.  The term "Companies" collectively refers to CLM, CP, and C&E.  The term "Sellers' Businesses" collectively refers to the "CP Business," the "C&E Business," and the "CLM Business," each of which is referred to in the preamble and described in Schedule A to the APA.

[6] App. 2166-67.

[7] App. 2139 (APA preamble).  The same is true of CP and C&E.  *Id*.

3

limited to any specific topics or segments within the claims and litigation management industries."[8]  Working in concert, CP provides an information repository and hub for related professionals,[9] and C&E is "in the business" of administering the conferences.[10] Notwithstanding the Restrictive Covenant, the APA expressly permits Sellers to conduct a limited number of events, but it forbids them from producing "content related to claims and litigation management" or "events, networking, seminars, award programs, and conferences targeted to claims and litigation management professionals."[11]

> Further, the APA contains an indemnification clause (Section 9.2) that states:

> The Selling Parties shall . . . indemnify and hold harmless Buyer . . . from
> . . . all Losses[12] . . . incurred or required to be paid by any such party arising
> out of or resulting from: (a) any breach of any . . . covenant or agreement of
> any Selling Party contained in this Agreement or in any Ancillary Agreement
> . . . .[13]

However, per Section 9.6, the APA does not limit indemnification for "claims relating to breaches of covenants, all of which may be asserted without limitation."[14]  Separate provisions of the APA discuss fee-shifting, but none expressly refer to fee-shifting in first-party actions.

## The Breach

---

[8] App. 78, 164.  It also puts on an annual conference, webinars, and specialty conferences.
[9] App. 2188.
[10] App. 2139.
[11] App. 2288-89.  It also prohibits publishing activity "directly [] targeted for claims and litigation professionals."  *Id.*
[12] The APA defines "Losses" to include "all reasonable attorneys' . . . and expert witness' fees incurred in connection therewith."  App. 2172.
[13] App. 2170.
[14] App. 2171.

In the spring of 2019, Potter and BIH began planning to host a Cannabis and Hemp Conference (C&H Conference) and an Intellectual Property Conference.[15] They identified conference topics, solicited sponsors, and promoted the events. Buyers twice demanded that they cancel the conferences, but Potter and BIH refused.[16] The C&H Conference took place in October 2019.[17] In 2021, Potter and BIH hosted additional events, including a Long Term Care Virtual Conference and a Cyber Security Webinar.[18] Thereafter, Potter sold BIH to Beacon Intercontinental Group, Inc. (Beacon).[19] Under Beacon, BIH continued to advertise certain specialty conferences and webinars.

Buyers also allege that Potter and BIH breached the Restrictive Covenant through their involvement with ClaimsX, a professional association of claims and litigation management professionals.[20] In September 2019, Potter introduced his sister, Sydney Posner, to a director of BIH, Steve Acunto. The District Court found that Potter knew Posner and Acunto planned to discuss a joint venture to compete with CLM, and that Potter's actions led to the creation of ClaimsX.[21] BIH thereafter maintained a "strategic

---

[15] The C&H Conference "centered on cannabis insurance and risk management" for insurance and cannabis industry professionals. App. 79. The IP Conference explored "risk management and insurance strategies to protect intellectual property assets" and "new insurance protections" available to insurance professionals. App. 79.

[16] In response, Defendants changed the names of conference sessions, advertising language, and the conference website.

[17] App. 1625 (C&H Conference); App. 1156-57 (noting the IP Conference did not occur).

[18] App. 558, 1261 (noting the Long Term Care Virtual Conference was hosted July 15-16, 2021); App. 559, 1466 (noting the Cyber Security Webinar was hosted July 29, 2021).

[19] Any claims between Beacon and Potter are not at issue in this appeal.

[20] App. 20 (describing ClaimsX and finding that it competes with CLM).

[21] App. 20-21.

partnership" with ClaimsX.[22]  The District Court determined this breached the Restrictive Covenant but Buyers "failed to show any damage resulting from [Potter and BIH's] involvement in the formation of ClaimsX."[23]

## PROCEDURAL HISTORY

Buyers sued Potter and BIH for breach of contract, tortious interference, and unjust enrichment.  They also sought attorneys' fees.[24]  The District Court held that Potter and BIH breached the Restrictive Covenant and awarded nominal damages, but it declined to award compensatory damages or attorneys' fees.[25]  It also enjoined BIH—but not Potter—from engaging in competitive activity for two years from the date the court issued its order.  Multiple parties appealed.[26]

The District Court had jurisdiction under 28 U.S.C. § 1332(a), and we have jurisdiction under 28 U.S.C. § 1291.  We exercise *de novo* review of the legal interpretation of the contract,[27] but we review factual findings about the parties' language

---

[22] App. 21.

[23] App. 21-22 (finding testimony regarding possible damage to CLM was "speculative").

[24] BIH also asserted five cross-claims against Potter, but only the cross-claim for negligent misrepresentation remained at trial, which the District Court rejected.  App. 11. BIH also filed a cross-claim in the Southern District of New York against Potter seeking indemnification under the APA, and that cross-claim was dismissed without prejudice.

[25] App. 26-27.

[26] Potter and BIH separately appeal the District Court's finding them in breach of contract.  The AICPCU and Institutes cross-appeal the duration and scope of the injunction, the decision not to award fees, and the denial of compensatory damages.

[27] *IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*, 438 F.3d 298, 318 (3d Cir. 2006). Delaware law governs the substantive interpretation of the contract.

and intent for clear error.[28]  We review orders granting injunctive relief for abuse of discretion.[29]

## DISCUSSION

### A. Breach of contract

We start by addressing BIH and Potter's alleged breach of contract.[30]  To obtain relief, Buyers must prove BIH and Potter breached the APA and that the breach harmed them.[31]  The Restrictive Covenant plainly prohibits "Selling Parties" from directly or indirectly engaging in "any business [activity] . . . that [is] otherwise competitive with any of the Sellers' Businesses," and it defines those businesses as covering the claims and litigation management industries.[32]  Accordingly, we agree with the District Court that the Restrictive Covenant prohibited "offering a specialty conference that provides content related to claims and litigation management or that targets claims and litigation management professionals."[33]

---

[28] *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 282-83 (3d Cir. 2014).

[29] *Chao v. Rothermel*, 327 F.3d 223, 225 (3d Cir. 2003).

[30] The District Court found—and Defendants do not dispute—that Restrictive Covenant is enforceable.  When interpreting contract language, we give effect to its plain language and look to extrinsic evidence only if the language is ambiguous.  *U.S. Legal Support, Inc. v. Lucido*, 2021 WL 4940823, at *5 (Del. Ch. Oct. 22, 2021).

[31] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[32] App. 2166; *see also* App. 2139 (describing businesses); App. 2187-89 (elaborating).

[33] App. 13-14.  The APA expressly excludes from the "Permitted Activities" list any "content related to claims and litigation management" or activity that "target[s] [] claims and litigation management professionals."  App. 2289.  This language informs the meaning of "activities that are [] competitive with any of the Sellers' Businesses[.]"  App. 2166; *see also N. Am. Leasing, Inc. v. NASDI Holdings, LLC*, 276 A.3d 463, 467 (Del. 2022) ("When interpreting a contract, [we] give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions.") (cleaned up).

Multiple parties challenge this construction of the contract language, but their objections lack merit. Buyers argue that the Restrictive Covenant prohibits BIH and Potter from putting on any conference pertaining to the insurance industry, but the APA plainly applies to *claims and litigation management*—not all of insurance.[34] On the other hand, BIH and Potter argue that the Restrictive Covenant only prohibits them from putting on the specific conferences offered as of the closing date, but the plain terms of the APA do not limit its application to preexisting conferences.[35] Indeed, it defines the businesses—and thus the prohibited competitive activity—in broad terms. We therefore decline to adopt either competing interpretation.

Further, the District Court did not err in finding that the APA applies to activity that occurs both pre-loss (i.e., assessing and analyzing risk) and post-loss (i.e., responding to claims). Because the APA does not define "content related to claims and litigation management," the District Court appropriately considered testimony and evidence at trial to reach its conclusion.[36] That evidence "show[ed] that there is a considerable overlap" between pre- and post-loss activities, and that claims administration and litigation

---

[34] App. 2166 (Restrictive Covenant); App. 2139 (describing businesses); App. 2187-89 (elaborating). The District Court thus rightly held that the Restrictive Covenant was "limited to the claims and litigation management industries, not the insurance industry generally." App. 618.

[35] *Id*. For example, CLM's business is not cabined to the ten specialty conferences enumerated in Schedule A. App. 2187.

[36] App. 15. *See U.S. Legal Support, Inc. v. Lucido*, 2021 WL 4640823, at *5 (Del. Ch. Oct. 22, 2021) (noting "courts may consider extrinsic evidence" "[w]hen a contract's plain meaning . . . is susceptible to more than one reasonable interpretation") (citation omitted).

management include both.[37]  Therefore, the APA covers "content related to the prevention, handling, and defense of claims or litigation."[38]  Indeed, the parties "clearly viewed any activity that provides claims and litigation management content or that targets claims professionals" as violating the Restrictive Covenant.[39]  That was not error by the District Court.

We ultimately agree that BIH and Potter violated the Restrictive Covenant by staging the various conferences described above.[40]  First, the C&H Conference, Long Term Care Webinar, Long Term Care Conference, and Cyber Security Webinar all "provided content related to claims and litigation management and targeted claims and litigation management professionals."[41]  These conferences also targeted claims and litigation management professionals through marketing, outreach, and solicitation.  Second, Potter and BIH engaged in prohibited activity through their involvement with ClaimsX.  However, the District Court did not clearly err when it determined that Buyers failed to prove they had suffered any damage from Potter and BIH's involvement in

---

[37] App. 16 (considering testimony from several witnesses with industry experience).
[38] App. 17.
[39] App. 14.
[40] The District Court also considered an alleged breach involving Potter's solicitation of Wilson Elser as a sponsor for BIH's C&H Conference.  App. 12.  We agree with the District Court that Buyers failed to prove that Potter's solicitation amounted to a breach of the APA because Buyers failed to show that it caused harm.  App. 24.  In particular, there is "no evidence" that the solicitation caused any reduction in sponsorships.  *Id*.
[41] App. 17.

ClaimsX.[42] We therefore affirm the District Court's holding regarding breach of contract.

## B. The injunction

As an initial matter, the Restrictive Covenant applies to Potter because he is a "Selling Part[y]."[43] Even though Potter breached the Restrictive Covenant, the District Court did not enjoin him because he testified at trial that he was no longer engaged in competition and had left the insurance industry.[44] In general, courts should not refuse to enjoin a breaching party merely because that party promises not to breach the contract again.[45] However, abuse of discretion is a high bar. In this case, Potter credibly testified that he had left the insurance industry and had no plans to return, and there is no evidence that he has turned his back on that commitment.[46] Accordingly, Buyers did not meet their burden to show that they would otherwise suffer irreparable harm absent a

---

[42] App. 22; *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015) (requiring plaintiff to "prove the *fact* of damages with reasonable certainty" to prevail in a breach of contract claim).
[43] App. 2185 (defining "Selling parties" as "the Companies, Adam Potter and Moxie.").
[44] App. 27, citing App. 1686-88 (describing Potter's testimony that he had left the industry and had no plans to return).
[45] *Hough Assocs., Inc. v. Hill*, 2007 WL 148751 at *19, n.97 (Del. Ch. Jan. 17, 2007) (noting that a party's naked promise not to violate a noncompete agreement generally does not justify the denial of an injunction); *see also Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 2003 WL 21056809, at *6 (S.D.N.Y. May 8, 2003) ("[A] bare promise by a party in the course of litigation to discontinue past or ongoing misconduct does not justify denial of injunctive relief, since such unilateral action hardly suffices to ensure that the party will not, in the future, reverse course and resume its challenged activities.").
[46] App. 1686-87. The fact that Potter has left the industry entirely and was subjected to cross-examination on this point far exceeds the type of assurance offered in *Hough*.

10

permanent injunction.[47]  It was within the discretion of the District Court not to enjoin Potter.

We now turn to the duration of the injunction.[48]  The Restrictive Covenant, per its express terms, was set to extend from June 1, 2018 until June 1, 2023—that is, five years after the Closing Date.[49]  However, in the event of a breach, the Restrictive Covenant provides that this five-year period "will be extended by the period of the duration of [the] breach."[50]

The District Court found that Defendants first "breach[ed] [the Restrictive Covenant] in October 2019" and again in May 2021.[51]  However, the District Court stated that by May 2021, Buyers had already "received the benefit of the non-compete provision for roughly three years[,]" the length of time between the Closing Date and the second breach.[52]  It then extended the Restrictive Covenant for two additional years from the date

---

[47] *N. River Ins. Co. v. Mine Safety Appliances Co.*, 105 A.3d 369, 379 n.47 (Del. 2014) (requiring the party seeking a permanent injunction to show "it would suffer irreparable harm" absent the injunction and "that the balance of the equities favors it"); *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (describing permanent injunction factors).

[48] We must "fulfill, to the extent possible, the reasonable shared expectations of the parties at the time they contracted." *See Comrie v. Enterasys Networks, Inc.,* 837 A.2d 1, 13 (Del. Ch. 2003) (cleaned up).

[49] App. 2166, 2139.

[50] App. 2167.

[51] App. 29 (prohibited activities in May 2021); App. 1625 (C&H Conference in October 2019).  The District Court also held Potter, on behalf of BIH, breached the non-solicitation provision in February 2019, but that Buyers "failed to prove that they suffered any resulting damage from this [breach]." App. 22-24.  We agree and, consistent with the District Court, treat the first breach as having occurred in October 2019 for the purpose of determining the proper scope of the injunction.

[52] App. 29.

of the court's decision.[53]  That was error because the District Court treated the first breach as inconsequential.[54]  Thus, we will credit as noncompetitive only the period between the closing date and the first breach.[55]  This has the effect of requiring a nineteen-month extension of the duration of the injunction.[56]  We will therefore vacate the injunction and remand it to the District Court with instructions to modify the injunction to remain in force until April 29, 2026.[57]

## C.  Damages

Finally, we address Buyers' claim that the District Court erred by refusing to award compensatory damages and attorneys' fees.  We agree with the District Court that nominal damages were appropriate because Buyers proved they were harmed, but compensatory damages were inappropriate because Buyers failed to prove the extent of

---

[53] The District Court entered its injunction on September 29, 2022, so it extended the injunction until September 29, 2024.  App. 9.

[54] That period extended for nineteen months from October 2019 (first breach) through May 2021 (second breach).

[55] That period extended for sixteen months from June 2018 (closing date) through October 2019 (first breach).

[56] Again, this is equivalent to the period from October 2019 (first breach) through May 2021 (second breach).

[57] The District Court held that the injunction must extend until September 29, 2024—that is, two years after the date of its decision.  Because we no longer credit as noncompetitive the nineteen-month period between breaches, we therefore extend the length of this injunction by nineteen months—that is, until April 29, 2026.

their injury with enough certainty.[58]  In cases like this, courts award damages equal to "the profits that the venture could have obtained but for the prohibited conduct."[59]  However, Buyers' expert calculated damages using a method that is commonly employed to evaluate potential mergers—and which depends upon basic assumptions that do not fit with this case.[60]  The District Court found that Buyers' expert failed to analyze information critical to assessing lost profits and market share[61] and determined that any lost profits caused by ClaimsX were merely speculative.[62]  These factual findings were not clearly erroneous, and the District Court did not abuse its discretion in declining to award compensatory damages on that basis.[63]

---

[58] App. 24.  Again, we review the applicable legal standard *de novo* and the factual basis for the damages calculation for clear error.  *VICI Racing*, 763 F.3d at 293.  We review the actual damages determination for abuse of discretion.  *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 437 (1996).  To be sure, courts require "less certainty" regarding the precise amount of damage when, as here, the "*fact* of damages" has been established, *Siga Techs., Inc.*, 132 A.3d 1108, 1131 (Del. 2015) (citations omitted), and doubts about the amount of damages are generally resolved against the breaching party.  *Id*.

[59] *Symbiont.io, Inc. v. Ipreo Holdings, LLC*, No. 2019-0407-JTL, 2021 WL 3575709, at *57 (Del. Ch. Aug. 13, 2021); *see also Penn Mart Supermarkets, Inc. v. New Castle Shopping LLC*, No. 20405-NC, 2005 WL 3502054, at *11 (Del. Ch. Dec. 15, 2005).

[60]  In particular, the Cournot Model, used by Buyers' expert, assumes that:  (i) a market has only two competitors, (ii) the competitors' products are homogenous, and (iii) the two competitors compete only once and make production decisions simultaneously.  App. 25-26.  It therefore assumes that each competitor captures equal shares of the market.  The District Court reasonably found these assumptions do not apply to the facts of this transaction.  App. 25-26.

[61] App. 26.  Nor did the expert consider how other factors, including COVID-19, could or did affect any possible decline in market share or sales.  The District Court thus found that "actual competition by Defendants had no effect on [Buyers]."  App. 26.

[62] App. 22.

[63] *See, e.g., Penn Mart Supermarkets*, *LLC*, 2005 WL 3502054, at *14-15 (Del. Ch. Dec. 15, 2005).

We also agree that Buyers are not entitled to attorneys' and expert fees.[64]  In

Delaware, parties to litigation are generally responsible for their own fees unless the

contract contains a fee-shifting provision that is "clear and unequivocal."[65]  Buyers argue

that Sections 9.2 and 9.7 of the APA, read together, provide that clear and unequivocal

language.  We disagree.  Neither section refers "to 'prevailing parties,' a hallmark term of

fee-shifting provisions."[66]  And Delaware courts have found contract language almost

identical to the language here to be insufficient.[67]

Moreover, the Indemnification Clause does not clearly and unequivocally evince

an intent to shift fees in first-party actions.  Section 9.4 defines "Losses" to include

certain attorneys' and expert fees, but that section—entitled "Settlement of *Third Party*

*Claims*"—does not apply to first-party actions.[68]  Subsection (f) provides for

indemnification regarding "the enforcement by any Buyer Indemnified Party of any of its

---

[64] We analyze these fee types together because the APA's provision governing "Losses" includes "all reasonable attorneys' . . . and expert witness' fees[.]"  App. 2172.

[65] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 7861336, at *5 (Del. Ch. Dec. 31, 2020) (citations omitted); *see also Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

[66] *TranSched Sys. Ltd. v. Versyss Transit Sols., LLC*, 2012 WL 1415466, at *3 (Del. Super. Ct. Mar. 29, 2012); *Comrie v. Enterasys Networks, Inc.*, 2004 WL 936505, at *2–3 (Del. Ch. Apr. 27, 2004).

[67] *See, e.g.*, *Deere & Co. v. Exelon Generation Acquisitions, LLC*, 2016 WL 6879525 (Del. Super. Ct. Nov. 22, 2016); *Chase Manhattan Mortg. Corp. v. Advanta Corp.*, 2005 WL 2234608, at *22 (D. Del. Sept. 8, 2005).

[68] App. 2170-72 (emphasis added).  Indeed, defining losses to cover fees *in general* does not extend an indemnification agreement to cover first-party actions*. Nasdi Holdings, LLC v. N. Am. Leasing, Inc.*, 2020 WL 1865747, at *6 (Del. Ch. Apr. 13, 2020).  Further, "Losses" are often defined to include attorneys' fees in indemnification provisions because indemnified parties usually retain counsel to defend against third-party claims. *See In re Bracket Holding Corp. Litig.*, 2020 WL 764148, at *16 (Del. Super. Ct. Feb. 7, 2020).

rights under this Section 9.2."[69]  But again, that is not sufficiently "precise language setting forth an intent to shift fees" in first-party actions.[70]  Nor does Section 2.4 evince clear intent to shift fees in this context.[71]  Notably, the parties used clear fee-shifting language in other parts of the APA.[72]  The failure to do so here reflects an intent to limit indemnification to third-party claims.[73]  We agree with the District Court's refusal to infer an intent to shift fees.

## CONCLUSION

For the above reasons we will affirm in part.  We will vacate the injunction and remand it to the District Court with instructions to enter an order consistent with this opinion.

---

[69] App. 2170 (emphasis deleted).
[70] *Bracket Holding Corp.*, 2020 WL 764148 at *16.
[71] App. 2145-47 (applying to net revenues).
[72] The APA referred to fee-shifting in four places.  Section 2.4 set forth a process to determine net revenues and costs via experts after closing in the event of a dispute.  App. 2147.  Section 9.4 set forth procedures for third-party claims.  App. 2170-71.  Article IX defines "Losses" to include attorneys' fees.  App. 2172.  And Section 10.1 states that "each Party will bear its own direct expenses incurred in connection with . . . this Agreement and the . . . transactions contemplated hereby."  *Id.*
[73] *Schneider* does not require a different result.  *See Schneider Nat'l Carriers, Inc. v. Kuntz*, 2022 WL 1222738, at *30 (Del. Super. Ct. Apr. 25, 2022).  Unlike here, *Schneider*'s indemnification provision clearly covered first-party claims.  It provided indemnification in the event Schneider failed to pay his counterparty, and the definitions section and notice provisions there confirm as much. The agreement in *Schneider* also defined "Losses" and distinguished "between indemnifiable damages arising from third-party claims and non-third-party claims."  *Id.*  Here by contrast, the indemnification provisions do not apply to first-party actions.  Further, different notice procedures govern third-party claims and claims arising from other losses, including those from first-party claims.  *Id.* at *30.

15